Okay, our final case this morning is No. 16-2321, NIDIC Motor Company v. Zansang Board Ocean Motor Company, Mr. Brown. Thank you, Your Honor. May it please the Court, I'm Scott Brown, appearing on behalf of the appellant. Mr. Browner, it sure seems to me you're making a constitutional argument on the PTAB's expanded panel procedures. If we can resolve this solely on the obviousness ground, should we do that to avoid hitting a constitutional issue? I think you should address the constitutional argument, Your Honor, and I'll get to why I think the Court needs to reverse the PTAB on the obviousness decision, but I think it is true that if the Court determines that the obviousness ground should be upheld, it doesn't have to get to the constitutional issue. Or to the other issue about whether it was proper to allow the institution and joinder of the anticipation issue, right? That is correct, Your Honor. I don't believe that you need to address the anticipation ground under Hidegi in any respect if you determine that the PTAB was correct in its obviousness determination under Bessler and Kosevich. Turning to Bessler and Kosevich first, then, since it's a linchpin to my position, the PTAB erred when it reached its ultimate legal conclusion that it was obvious to arrive at claims by combining Bessler with Kosevich. As we argued to the Board below, Bessler specifically teaches away from the combination because Bessler specifically teaches to eliminate one of the limitations that is found in each of the independent claims of the 349 patent, and that limitation is a system controller. But a thermostat can serve as a system controller, right? Well, the 349 patent says a thermostat can serve as a system controller, that is correct, but it doesn't change how it has referred to what it is that a system controller does. So in other words, you could have a smart thermostat that had system control functions integrated into it, and then it would be a system controller. It would no longer be a system controller because it also performs thermostat functions. Is there anywhere that Bessler says that its principal objective is to eliminate a system controller? Yes, Your Honor. That is, in fact, the first object of the inventions in Bessler. Bessler is found in the appendix starting at 215, and if you turn to page 222. Which volume is that? I'm sorry, Your Honor. It is the first volume of the joint appendix. 215. Actually, I'm going to be quoting from page 222, which is in the body of Bessler. Column four. Column two, starting at line three or so. It is an object of this invention to provide a central heating, air conditioning, and ventilating system, which does not require a system controller. That's the first object of the invention. And if you turn to the next page in column three, what is it that Bessler is referring to as a system controller? At about line 55, it says, system controller 104 monitors the difference between the actual temperature of the air and the preset temperature, which is desired, both of which are indicated by electronic thermostat 102. This temperature difference is converted into a signal defining the speed and airflow rate of the system. Now, that's what a system controller does. It creates these system demand signals, such as demanded speed, demanded torque, demanded airflow. That's how the 349 patent refers to a system controller in the intrinsic evidence. That's what it says it does. And then continuing in Bessler, so Bessler is referring to the same thing. This thing that produces these kinds of system demands. And then he says in column... This contemplates having a thermostat in addition to a system controller, right? Bessler does, yes, Your Honor. Bessler, and much of the prior art, distinguishes between a thermostat and a system controller in terms of those functions that they're performing. But Bessler then says, in addition to the object of the invention, in column four, at line 31, he says, referring now to figure 2, one preferred embodiment of a system according to the invention is shown in block diagram form. As compared to figure 1, the system of the invention illustrated in figure 2 eliminates the need for system controller 104. But doesn't Bessler move the components of a stand-alone controller into other parts of the HVAC system? I don't believe that's correct, Your Honor, because a system controller in the 349 patent is developing these system demand signals. The point of Bessler is that he has found a way to use the microprocessor that's in the motor controller with a lookup table to take the cyclic on-off signals that come from the thermostat and directly convert those into the motor control signals. The motor control signals are the commutation signals that are supplied to move the motor itself. So Bessler eliminates this need to interpret system demand into a system signal that then a motor controller then interprets and turns into a motor control signal. But he's not eliminating the thermostat, because in parts that you didn't read, this patent goes on to recognize that there will be a thermostat. Yes, unquestionably, with Bessler, you still have to have a thermostat. The point that we're making is when the 349 patent first says what a system controller does, it develops these types of system demand signals. Then a few paragraphs later, it merely says a thermostat may be a system controller. When it says that, it doesn't change what it is that a system controller can do. So a smart thermostat could be a system controller. It doesn't matter where you put that functionality so long as you have a structure that is developing the speed demand, torque demand, or airflow control demand. So the whole point of Bessler is to eliminate anything that needs to develop those signals because he has a way within his microprocessor. But an on-off signal is something that comes from a thermostat. Yes. And it would be necessary in any system, right? Yes. So why isn't that within the plan line? Because as referred to by the 349 patent, which is at appendix page 52 I'm going to be reading from, in column 3 at line 59. This is what the 349 patent discloses a system controller is. The motor controller 404, I'm sorry, it's at page 52 of the appendix at column 3, line 59. The motor controller 404 is configured for performing sine wave commutation in response to one or more analog or digital control signals received from the system controller 402 to produce continuous phase currents in the permanent magnet motor for driving the air movement component 410. Then it says, the motor controller is coupled to the system controller for receiving such control signals directly from the system controller. Such control signals may represent, for example, a desired torque or speed of the motor. Alternatively, the control signals may represent a desired air flow to be produced by the air moving component. And it's those desires that are interpreted from the thermostat. That it doesn't view the thermostat as performing these functions? That's correct. The thermostat is not performing these functions developing signals such as desired torque, desired speed, and... Those functions are not in claim 1. Well, our position, Your Honor, is that any system controller, and this was also in the extrinsic evidence, that one of ordinary skill would understand that that's what a system controller does. And claim 1 requires there to be a system controller, and it also requires there to be system control signals. It just doesn't name the specific ones that are named in the column of respect that I just read from. But when we deposed Dr. Assani, he admitted that that's what a system controller does. It creates these types of signals. And Dr. Blank, in unrebutted testimony in his declaration, says that's what one of ordinary skill in the art would have understood what a system controller is. So you're objecting to the board's construction of a system controller? Well, what the board did, Your Honor, we certainly argued it, and they argued it as a claim construction issue. What the board did was when it addressed our teaching away argument, they said we discern no requirement that the system controller has to be a standalone feature. It could be incorporated into something else. Therefore, the teaching away argument is not commensurate with the scope of the claim. So it is a kind of claim construction issue. The problem was is the way the board addressed it, they didn't address our argument, which is that a system controller has to be developing these signals, and that Bessler says get rid of that kind of system controller. We don't need to develop these kinds of signals. So when the board says that it's not commensurate with the scope of the claim, they got it wrong what a system controller is. Even if this court were to decide that a system controller does not have to develop those kinds of signals, the board was still ignoring the fundamental teaching of Bessler when it said that one of ordinary skill would reach out to Kosevich and combine it with Bessler. The reason we say that is the main point of Bessler is reducing complexity in an HVAC system. Get rid of a system controller. Reduce the number of microprocessors. We have a way to do it with this single microprocessor  That's the fundamental teaching of Bessler. Now we also cited to the Chen reference to the board below, which established that one of ordinary skill in the art would have understood at the time that to do sine wave commutation using the DQ frame of reference, which is specifically called for in the claims, requires more complexity. It requires a lot of math, a lot of processing power to do the math, because you have to change on the fly from a calculation that's done in one mathematical frame of reference, convert it to another mathematical frame of reference, convert it back again to the original frame of reference, and the Chen reference says that requires a lot of computing power. So one of ordinary skill would have understood that to go to sine wave commutation, as suggested perhaps by Kosevich, or at least mentioned by Kosevich, in an HVAC system, you have to increase the complexity of what Bessler has disclosed. And the holistic teaching of Bessler is we're trying to reduce the complexity. So when the primary reference is saying reduce the complexity, why is one of ordinary skill going to reach out to this doctoral thesis? That's a pretty general argument. I mean, Bessler certainly, in your own view, not talking about sine wave motors. Unquestionably true. Bessler does not mention sine wave commutation. We're saying that one of ordinary skill who's reading Bessler... Anything you're reading Bessler is saying that anything that's more complicated is ruled out? I'm reading Bessler as saying that the intent of Bessler is to reduce the number of microprocessors involved, to simplify the calculation that's being involved, and to then reach out to Kosevich and pick a far more complex way of controlling the motor and saying you would combine Kosevich with Bessler to get to the claim is picking and choosing from Bessler what you want. And the board had to read the entirety of Bessler and for everything that it teaches. And what Bessler is teaching is remove the system controller, reduce complexity, and you would not then go from Bessler to Kosevich to find a more complex system to achieve the result that Bessler's talking about. That's the second point on the teaching away. I'd like to turn, at least briefly, to the issues raised by the Hidegi reference. When the board instituted and determined that under 315C it had the discretion to ignore the time bar of 315B, it committed an ultra-virus act beyond the power granted to it by Congress. And this court can, in that circumstance, despite what 314D says, can consider the issue and determine whether the board's statutory construction was correct. Under COSO, the Supreme Court said... Well, what is meant when the statute says that you don't have to worry about the time bar in connection with joinder motions? Well, you have to understand what a proper joinder motion is at that point. The statute certainly says under 315B that the time bar doesn't apply to joinder motions. But then you have to look to 315C to see what is a joinder motion. Or a joinder. I don't know if it's a joinder motion, but it's a joinder under 315C. Under your view, what problem was that language seeking to solve since you argue that the joinder motion is only proper if it's timely? Well, I argue that the joinder motion is only proper if it's another party who's trying to join into the existing procedure. It doesn't have to be timely? Well, if you have... 315D, I believe, would address the situation where there was a properly instituted, timely instituted IPR because the director under that provision can consolidate. But it's what you're saying. If they were different parties, forget about the argument that you can't join the same party. I'm not sure that's correct. But let's assume that it's different parties. You mean to say that under those circumstances a different party who's untimely can be joined and its IPR instituted? I think that's plainly what the statute says under 315C. If the director has... And to bring in additional issues? No, the statute doesn't say that they can bring in additional issues. It's silent on that point. It talks only about party joiner, not issue joiner. I don't think you have to even address whether that new party... But I'm worried about it. So address it. All right, well, we think on the face of the statute that it is not granted that they could bring in new issues. The statute simply says party joiner. It does not say issue joiner. And if the power's not granted to the director to use his or her discretion to ignore the time bar, then... So your view is you can bring in a party who's untimely but not an issue, a new issue? That's correct, Your Honor. And that is all based on the fact that a party can't join itself. You can join a party, but if you're already a party, you can't join yourself. You know, you join a proceeding. A party joins a proceeding. Yeah, but it would have to be a non-party. I mean, if they're already a party to the proceeding, then you can't join themselves to the same proceeding. Well, I'm not sure that's true, but it doesn't solve the problem anyway  where the third party is sought to be joined, bringing in a new issue, which would otherwise be untimely. That's not the issue that's presented at this point, Your Honor. Does it matter that in this case the issue that we're talking about is one that was before the board in the first IPR? I don't think that matters at all because we're just strictly talking about what grant did Congress give, what was the statutory grant of power that Congress gave? It gave them the power to join a party after the time bar. It didn't give them the power to join an issue after the time bar, and that's what's happening here. They're joining an issue after the time bar. The party was already there. That issue was before the board in the first IPR, correct? It was, and it was not allowed because they had not filed properly a translation of the underlying Hedeggie reference. So the board determined that it couldn't consider it, and then the time elapsed, and then they tried to get in using this party jointer under 315C. You're well into your rebuttal time. Do you want to save it? Yes, Your Honor. May it please the Court? Good afternoon, Your Honors. I just want to raise three points this morning in the limited time. I'm troubled by the notion that an issue which is barred is untimely can be brought in by this mechanism. It just doesn't seem to me to make a lot of sense that Congress would want to allow that to happen by the jointer mechanism where you have a party whose time bar and is raising a new issue, and that person can be brought into the proceeding by the jointer mechanism. It really just doesn't feel right. Respectfully, Judge Dyke, that is exactly the scheme that Congress promulgated in Section 315. Why would it want to do that? Well, I can speculate why they want to do that, and I'll get to that in just a second, but I just want to make clear that the time bar is in 315B, and 315B concludes with a sentence that says expressly that the time bar does not apply to motions for jointer filed under 315C. But the question is, what does that language mean? In addressing what that language means, we have to make some inquiry into what the congressional purpose might have been. Fair enough. And I think the language about whether or not the time bar applies to motions for jointer is not really controversial. 315B says expressly it does not apply to 315C. 315C is where we find jointer. Why Congress wanted to give an exception for jointer, I suspect is so that when a patentee sues somebody for infringement, there's basically a one-year period where that infringer can hail that patentee before the PTAB and raise an IPR. If that one year goes by under 315B, that petitioner cannot hail that patentee in front of the PTAB for the first time. If somebody else brings the petitioner... I'm sorry, brings the patentee into the IPR... I'm sorry, to the PTAB in an IPR, then I also don't think it's controversial that the patentee, that the bar that applies as against the petitioner would no longer apply. Well, I think that's fair enough to say that if there's a proceeding pending and an untimely petitioner wants to join the proceeding, that that should be allowed, and that seems to be what Congress intended. But what seems strange to me is that that new petitioner, who would otherwise be untimely, can add new issues to the proceeding. Why would Congress have wanted to do that? Well, I don't think I can speak to that except that at least one member of Congress, Senator Kyle, actually said in his statement that he believed that this could be used to bring in new issues. But I also think the text of the statute is what gives us the answer here. 315C does not just require a party come in and ask to join, but it requires a new petition, a petition that the director has to decide warrants institution of a proceeding. Judge Dyke, if there was no way to bring in a new issue, there would be absolutely, positively no reason for Congress... But is this a new issue? It's one that was before the IPR that was rejected as a grounds for initiation. Well, Judge Rayner, we would call it a new issue because it had not been instituted previously, but I think your question speaks to a different issue in this case, which is the board's discretion. The board decided that it was reasonable to bring this in here because, Judge Rayner, of that exact point, that this was already in front of the board. It had already been raised by the petitioner. That's a really narrow interpretation, and I'm closer to buying that than the larger interpretation where someone can come in, doesn't appear that you have any discretion as to whether you're going to allow joiners. It says, shall not apply to request. I mean, I guess if you show up, you have very little discretion when you're going to permit to join or not, but to bring a new issue at that time, and I believe that's what you're arguing or saying, correct? No, Your Honor, I would disagree with you. That's kind of what I want to get to, and I believe that's what Judge Dyck is asking about. Certainly you can't have a situation where you're allowing parties to join and they're bringing new issues, especially issues that have already been rejected. Well, we have other mechanisms to deny parties bringing in issues that have already been rejected. As to the question about the discretion in 315C, it is hardwired into the statute. The statute says that the director in his or her discretion may join as a party. What was the discretion here? What's the reasoning? Why did you permit this joiner? Well, Your Honor, I believe the PTAB permitted it, if I may continue. The PTAB permitted it here because it was not unfair to subject the patentee to this issue when it had already been raised in the first instance, and the technicality that led to the problem was the lack not of a translation, but of a certification. It's your technicality. Absolutely, Judge Ranney. It's our technicality, but we also have discretion about whether or not we want to look around. What kind of uniformity or certainty do we have in that where the PTAB can look at a prior decision and say, well, we don't like that. Let's jump back in there and change that. How does the director choose which judge to assign to expand the patent? That's provided, Your Honor, by our standard operating procedure, and the chief judge actually makes that decision, and the judge is selected based on their technical and legal competency, and over the years, many, many panels of the board have been expanded. In fact, if you looked at the 30... Are they selected or are they going to rule in a certain way? Well, people can be placed on the panel. For example, the director can place him or herself on the panel, and certainly the director knows how they're going to rule. NIDAC has not said, and they say at their blue brief at page 43, that they don't challenge the independence of these judges on this panel. These judges were not selected and told to make a particular decision. If judges could be told to make a particular decision, there'd be no need to expand the panel in the first place. But there was no objection below to the expansion of the panel. That's correct, Your Honor, so we would say that they've waived that also, that they've waived this entire issue. I just want to get back, just for a second, if I might, Your Honor, about the discretion issue. If you look at the times this issue has come up, and I would direct the Court's attention to page 40 of our brief, where we lay out several examples of where the Board has entertained these sorts of petitions, and I'll raise another one here today. It's a case called Amnil Pharmaceuticals v. Endo. In that case, the petitioner came in after the time bar with two new issues. One new issue had been triggered because the patentee amended their complaint in district court to add a new claim, a claim that had never been asserted against that petitioner before. And then another new issue that had been joined by the petitioner in their second out-of-time petition was something that corrected a sort of flaw in reasoning that they got out of the first institution decision. The Board granted that second petition in part. The Board said it's fair to bring in this new claim because you were never... Well, maybe that's because the new claim should be construed to be the equivalent of a new proceeding, a new infringement proceeding. I mean, you can work that under the language of the statute. What's troubling is we're talking about claims that were asserted before and we're bringing in of the new claim by this petitioner or by some third party is untimely. Respectfully, Your Honour, I don't think that we can parse out second petitions based on which claims were asserted in the first lawsuit based on the statute. The statutory one-year bar is based on an assertion of infringement under the patent that served with a complaint that you're infringing a patent. It doesn't matter which claim is asserted. It triggers the one-year bar. But, Your Honour, I think it does matter for the purposes of demonstrating how the discretion works sort of on the front lines of the Board that they don't simply let petitioners file follow-on petitions all the time and let them get in. Each time they use and exercise the discretion committed to the agency in 315C itself. And as to the new issues, Your Honour, I would just say again that the ability to raise new issues is suggested expressly by the statute when the statute commands the Director to make a determination about whether that... So is part of that determination, does it include due process considerations, the effect on the existing parties and whether they've had adequate opportunity to respond? That's exactly the kind of things that are considered when the exercise of discretion is triggered under 315C. How long has it been? Will it slow the proceeding down? Is this something that the petitioner is doing to essentially harass the patentee by getting the first decision out of the PTAB, fixing up the petition, changing... Yeah, but the decisions here and in Target sound very much as though there's no concern about the fact that the time bar is being evaded by this mechanism of joinder. Your Honour, the time bar isn't being evaded by the mechanism of joinder for the simple reason that the time bar does not apply to joinder. Congress put that in 315B. Well, maybe. That's the question of how we construct. And in addition to the time bar concern, which I share, I have an additional concern, and I think you may have addressed it in full, but let me re-say that. You have a process... The PTAB process, in my view, has to operate in a way that creates uniformity in your procedures. And here you rejected a prior art reference, and then later you allow it to come back in. And... I mean, it's as simple as saying you're giving two bites to the same apple to some parties, but not to everybody, and you get to decide who gets the two bites, how big of a bite, what kind of apple, the whole thing. It's not open. What is open is that when that prior reference was initially brought, and it was brought defectively, and it was rejected, and I would have affirmed that rejection, and now to bring it back alive and well, there's no way for me to review that. And let me add, what bothers me is the metaphysical concept of a party joining itself. It seems like you have Schrodinger's party, or Schrodinger's cat as a party, and at any given point, when you look under the cover of the litigation, it is or it isn't. And only the director really, or the chief judge, gets to decide that. And nobody knows. Since the essence of the law is predictability, I find that bothersome. Your Honor, as to joinder, we agree that there's such a thing as same-party joinder, and there's such a thing as party joinder and issue joinder. Those are treated distinctly in the Federal Rules of Civil Procedure, Rules 18 and 19. This statute is different. It's ambiguous. It says joinder. It does refer to joining another party, any person, but it also talks about the need for a new petition. So for those reasons, we'd say it conflates the two issues. Going back to consistency, Judge Reyna, there's two issues. The one issue is the consistency of a panel reconsidering its own decision. That's what happened here, and we would submit that that's what happens all over administrative tribunals. There's another issue of consistency, which is the ability of the management of the agency to control consistency from case to case through the mechanism of expanding balancing. You know, I agree with that. And-and-and the-the... where I began to depart from that is-is where a due process concern pops up, and it's here. I'm not sure it's a glaring problem here, but it's-it's enough to-to... It emits enough light to-to... for me to make the comments to you that I have and to have the concerns as I've expressed them to you. I understand, Your Honor, and the-the... I think as best I can tell the court, and-and I don't know that this will be satisfying to you, but the people, the judges listed on the opinion are the judges who made that decision without any influence. I can say that because I know that. And I can also tell you that when judges are added to panels where they do exert influence, their names are on the panel. The-the judge... The PTAB expanded a panel in a case called Master Image that's cited frequently in front of this court, and you will look at that expanded panel and you will see the acting chief judge's name on that panel. That's because that acting chief judge influenced the outcome of that decision by being a member of the panel and discussing it with those panel members. Here, you will not see that, and that's because these five judges are the sole five judges who made this decision. All right, thanks for that explanation. Okay, thank you, Mr. Conley. Thank you. Yeah, let-let me just add one thing, and that is, as Judge Reynolds said, I recognize the-the need for consistency. We do that by going in vain. It-it-it's a... It's also a principle of predictability. It just is a bothersome way of doing it. And-and we think the way to ensure predictability by continuously making sure the law is resolved the same way is a feature of our system and not a bug of our system. Thank you. Okay, thank you. Mr. Mayer. Good afternoon, Your Honors. Um, may it please the court, um, Steve Mayer appearing on behalf of Appalachia's Broad Ocean. To... On the Bessler-Kobczyk ground, NIDAC had to show that the prior art teaches away from the invention as recited in the challenged claims. In its reply brief, NIDAC cites to the declaration of its expert, Dr. Blank, appearing at Appendix Pages 768 through 770. However, this testimony was about Bessler teaching away from the proposed amended claims, not the challenged claims at issue here on appeal. Unlike the challenged claims, the proposed amended claims, which appear at Appendix Pages 761 through 763, expressly recited that the system controller sends one of a demanded torque, demanded speed, or demanded-demanded airflow control signal. The challenged claims do not limit the system's controller's signals to these three signals. In fact, those three specific signals are recited in dependent claims 11 through 12 and 20. Under claim differentiation, therefore, the independent claims and the control signal recited in those are not limited to a demanded torque, demanded speed, or demanded airflow control signal. Now, Mr. Brown also cited to the deposition testimony of our expert... Can you address your opponent's arguments on teaching away? Yes. Okay, with respect to... Well, first, if I could complete that thought. Dr. Assani, they cite to Dr. Assani's testimony about teaching away, and that's at Appendix Pages 641 through 642. There, he was not talking about the meaning of a control signal as recited in the challenged claims, or Bessler's Thermostat 202 is not a system controller within the meaning of the claims. Dr. Assani was first directed to the passage in the 349 Patent Specification stating those systems, that the system controller 402 may send control signals such as desired torque, speed, or airflow. Dr. Assani was then pointed to Bessler's Prior Art Controller 104, not the thermostat, but 104, and was asked if it did the same thing, and he said yes. So he was being asked about the system controllers and system controller, not about the thermostat. Now, if I could direct your attention to Bessler Figure 1. That's at Appendix Page 217, and we see both a thermostat and a system controller. And to the right of the system controller in this figure is a list of functions that's performed. The first one is temperature delta setting, setting versus actual, conversion to speed and airflow commands. Now, if we go to the next page, this is Figure 2. This is Bessler's invention. The same function is now pushed down to the motor controller. You'll see in the outdoor unit over to the right, 2006, it says TSAT cycling conversion to speed command. And then to the left under the indoor unit, it says TSAT cycling conversion to airflow command. So the functionality has been pushed down from an intervening system controller to a motor controller. So he's not getting rid of a microprocessor that performs these functions. It's just changing the location. Now, if we can direct your attention to the next page, Appendix Page 219. What about where he says at the beginning of the patent, well, one of the primary goals is to eliminate it? To eliminate a system controller. Right. But then I raise with your opposing counsel. He does push it down. He pushes it down. I think they're trying to create some confusion with the name system controller. This is not an Ipsodemus test. Okay, so you have thermostat and system controller in the prior art of Bessler. They use the word system controller in the 349 patent where it can mean the system controller in the prior art, the same as Bessler, or it can mean a thermostat. Either one. So therefore, when you then look at the invention of Bessler, it says thermostat. But under the definition of what can be a system controller in the 349 patent specification, it says it can be a thermostat. Not only that, the specification says that the signals can be analog or digital. So even if the thermostat is sending analog systems such as on and off, it is still a control signal within the definition of control signal in the 349 patent. So it is exactly the same. Now, they also mentioned so I don't think that Bessler teaches away at all. NIDAC also cites to Chen, the Chen patent. The Chen patent does not teach away. The Chen patent has two methodologies for performing sine wave commutation. One of which is the current control mode. And that uses I, I sub Q, I sub D, and that is what their patent does. And it also discloses a second methodology, a voltage mode control method, which instead of using the current measurements to develop the sine waves, it uses the voltage. That second method is not within the scope of the 349 claims. 349 claims are directed to current, not voltage. So therefore, the fact that it has two alternatives and it doesn't disparage the one, it just says one is more expensive because you have more components. Now also, they seem to be backed on in the argument that, oh, no one has ever used or the common wisdom at the time was not to use sine wave commutation in HVAC motors. And at that point below, they said that it was against common sense because it was economically infeasible. Because of the very tight margins that were used by builders in selecting the HVAC systems that would be implemented in the buildings that they were making. So, they raised that argument and that was their common sense argument below. We pointed out that that's contrary to this circuit's case law. You can't rely upon economic infeasibility to teach a way. So they dropped that. Now they're saying, oh, it's common wisdom that nobody ever used sine wave commutation in an HVAC motor. In fact, it is done in HIDEGI. And that was a finding of fact made by the board in its final written decision. Not only that, during the oral argument, Mr. Brown agreed that HIDEGI shows sine wave commutation in an HVAC system. And their response is, well, the Chenery Doctrine precludes this court from considering HIDEGI in connection with rejecting the basis of their teaching way argument. The problem with that is under Chenery, this court can consider issues as long as it does not involve a finding of fact to be made by this court in the first instance. Here, with respect to HIDEGI's teaching, it's clear on its face they admitted it at the oral argument and it's also a finding of fact in the final written decision. So therefore, the Chenery Doctrine does not prevent this court from considering that at all. Also, with respect to the motivation for combination, Chen also discloses that sine wave commutation is preferable to square wave commutation because it's more likely to not generate the torque ripple and the NIDAC says in its reply brief that we did not raise that below. In fact, we did raise that below and the page of our reply brief we did not cite that so it's not in the appendix but it is in the joint appendix. With respect to now do you have any further questions on this Vessler COSIBIC 103 ground before I move on? Okay. With respect to the institution decision, there seems to be a little glossing over what happened below. We took over this case from another firm. Another firm filed the petitions. They filed the Hideji reference in Japanese. They filed an English translation. They did not file a certification of the accuracy of the translation and it was rejected on that ground. We then requested that we be allowed to file that as an oversight. That was rejected. We asked to file it for as supplemental evidence. That was rejected. Now with respect to consistency by the board, those were made immediately after the institution decision. Because what happened was they refused to institute as to Hideki. So then you made the motion. No, I don't believe that's correct. They pointed out in their preliminary response that this was not included the certification and therefore the board should disregard Hideki. At that point, I believe, we moved to, we called up the board and said, look, we believe that this is an objection. It's untimely because it was made before the institution decision, not after. And we would like to file supplemental evidence. The board said, well, forget about filing supplemental evidence. We will give you a chance to file a motion to correct it because it was an administrative oversight. We did that. That was denied. And then the institution decision came out. We moved then, well, we filed a request for rehearing and we also requested leave to raise this  about supplemental evidence that we raised in the phone call but was summarily disregarded by the board. They just said, don't worry about that, go this route, the administrative oversight. They said, yes, we added to it our request for rehearing in the first case, in the first institution. That then was denied and our only recourse then, the very last recourse that we had was to file a   within the three months, within the one month. I'm sorry. Really? Because what it shows is there were multiple mechanisms for correcting what happened in the first instance that didn't involve reliance on this joinder provision if the PTO wanted to allow the error to be corrected. But in other cases in the same exact fact pattern they did allow that and in fact allow what? Allow the correction to be correct. Okay. So and what was interesting too if the institution decision rendered on the second petition it denied the petition based on technical grounds saying that we couldn't join but they did look at the merits and they found that it was reasonably likely that Hdegi did result in these claims being would be held unpatentable and then they said well we can't get into that but at that point the general public had an interest because there was a finding of reasonable likelihood of unpatentability based upon this reference and the only reason that it wasn't considered in the first instance was because there was no affidavit of technical accuracy and in fact there has been no error pointed to or identified in the original translation. Now  have any questions for me I see that I'm running out of time. Mr. Brown you have a couple minutes here. We'll give you two minutes. Two minutes. Thank you your honor. No two two. The PTO argued that they were unsure of what the Congress was doing when it decided to write statute 34315C the way it did. I guess I would like to point out that there is they seem to think they were pretty sure. Well the statute said that 315C was there to allow other parties to join. That's all it says. So that's the clearest sign of the congressional intent on section 315C. You're supposed to give it its ordinary meaning party joinder means joining a new party. It's not issue joinder. So secondly there was a suggestion that we didn't object below but we did object to expanding the panel below when the motion for rehearing was filed and when we were given an opportunity to respond to the motion for rehearing we objected to expanding the panel at that point in time. We did not know even when the panel was expanded and ruled against us that the panel had been stacked until the oral argument I beg your pardon your honor we objected to expanding the panel in our brief which was filed in 1711. I cited it in our reply brief as well your honor. I can find it quicker  It starts at 1711. Thank you counsel. It starts at 1711 in our brief which was filed in the appendix. Which page does the  appear on? I cited it in my reply brief your honor. I            in the appendix. Thank you counsel. It starts at 1711. Thank you counsel. I object to expanding the   1711.    object to expanding the brief to 1711. Thank you. I can't find it. I see the time is up. I think there are other questions. Thank you. Thank you.